IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MENNONITE GENERAL HOSPITAL, INC., HOSPITAL MENONITA PONCE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>JOSÉ CARLOS VÉLEZ COLÓN, VÉLEZ LAW GROUP, LLC,<br><br>Defendants. | Case No. 26-1430<br><br>Re: Damages for defamation under Article II, Section 8 of the Puerto Rico Constitution; (ii) the Libel and Slander Act of 1902, 32 L.P.R.A. §§ 3141-49; and (iii) Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801. |

## COMPLAINT

TO THE HONORABLE COURT:

COME NOW Mennonite General Hospital, Inc. and Hospital Menonita Ponce, Inc. (both d/b/a Sistema de Salud Menonita) ("Plaintiffs" or "Menonita"), by and through undersigned counsel, respectfully STATES, ALLEGES, and PRAYS as follows:

### I.   INTRODUCTION

1.    This is a civil action for damages arising from a deliberate and calculated publication by Defendants that disseminated false and reputationally destructive statements concerning Plaintiffs website, digital practices, and integrity as operator of healthcare providing facilities and related services.

2.    The challenged conduct did not occur in a vacuum and was not the product of a mere misunderstanding, casual online commentary, or careless shorthand. Rather, it formed part of an organized course of conduct carried out through a Facebook page and related social media presence known as *Ley ADA Puerto Rico*, a platform under the control of Defendant José Carlos

Vélez Colón ("Mr. Vélez") and his law practice exercised through Defendant Vélez Law Group, LLC. The page publicly presents itself as an awareness and reporting page concerning disability rights and accessibility but that, in practice, operates as a mechanism to attract attention through alarming allegations, identify potential claimants, and route those people toward Mr. Vélez and Defendant Vélez Law Group, LLC for possible new claims and lawsuits.

3.    Through that platform, Defendants have made false and defamatory statements consisting in publicly accusing Plaintiffs of "spying" on visitors to Plaintiffs website ("*espía a sus visitantes*") and implementing a "worrisome digital surveillance scheme" ("*esquema preocupante de vigilancia digital*"), and sharing information with Meta, Google, Amazon, and others without the knowledge or informed consent of visitors.

4.    Defendants make these accusations as factual assertions. Defendants expressly present the accusations as having been "discovered" ("*descubrió*") by an "investigation" ("*investigación*") and an "independent digital privacy inspection" ("*inspección independiente de privacidad digital*"), thereby representing to readers that the accusations are factual, technically grounded, and objectively verified.

5.    The challenged accusations are false.

6.    Plaintiffs' website uses common and widely adopted digital technologies, including analytics, tag-management, re-marketing, and infrastructure tools. Such tools are not unusual. They are widely used throughout the digital ecosystem, including by institutional websites, educational entities, nonprofit organizations, and healthcare portals.

7.    Plaintiffs do not conceal those practices. Contrary to Defendants' false statements and defamatory statements, Plaintiff's website contains publicly available cookies and privacy disclosures that describe the existence and use of cookies, analytics, and related website

2

technologies, and disclose categories of information that may be collected automatically. The website (a) identifies categories of third-party tools used; (b) explains the purposes of those tools; (c) provides user options concerning nonessential cookies; and (d) state that medical or clinical data are not shared with advertising or analytics platforms.

8.    The principal functions of the referenced tools are statistical measurement, optimization, technical management, and infrastructure performance. These do *not* transmit protected health information ("PHI").

9.    Defendants nevertheless transform disclosed, ordinary, and technically commonplace website practices into a false and sensational narrative of covert spying, secret tracking, and exploitation of vulnerable patients and family members.

10.    Defendants then use that false narrative as part of a broader litigation and clients generation strategy. The same page that published the challenged accusations also invites readers to report alleged law violations, seek direct legal advice from Defendants, communicate confidentially, and contact Mr. Vélez and Vélez Law Group by email, phone, and messaging channels for potential legal action.

11.    Defendants' statements are published to a substantial audience of potentially tens of thousands of viewers, have generated hundreds of reactions, comments, and shares, and are designed to injure Plaintiffs in the precise area where healthcare institutions are most vulnerable: public trust, patient confidence, ethical reputation, and confidence in the institution's handling of sensitive information. Upon information and belief, Defendants further amplify the reach and impact of the defamatory statements by utilizing Facebook's paid advertising and sponsored-post features, causing the publication to be intentionally disseminated beyond Defendants' organic audience and to targeted members of the public. By promoting the statements as sponsored

content, Defendants increase the visibility, circulation, and credibility of the false allegations, ensuring that they reach a significantly broader audience than would otherwise have occurred. Defendants' deliberate and unlawful actions have inflicted and continue to inflict substantial and irreparable harm upon Plaintiffs.

12.    Defendants' conduct caused and continues to cause significant harm, including reputational injury, loss of goodwill, diversion of internal resources, mitigation costs, and continuing prospective harm from ongoing circulation of the challenged statements online.

## II.  JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

15.    This action is between citizens of different states and complete diversity of citizenship exists between Plaintiffs and Defendants.

16.    The amount in controversy exceeds $75,000.00, exclusive of interest and costs, because the challenged statements accuse Plaintiffs of secret spying, unethical and exploitative treatment of patients and visitors, and covert data sharing practices, and because the resulting injury to reputation, goodwill, public trust, and business operations far exceed that threshold. At this time, the amount in damages is calculated at $5,000,000.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in Puerto Rico, the challenged publications were directed to and circulated in Puerto Rico, the harm was suffered in Puerto Rico, and Defendants conduct business in Puerto Rico.

## III. THE PARTIES

20.    Plaintiff Mennonite General Hospital, Inc. is a nonprofit corporation organized under the laws of Puerto Rico with its principal place of business in the Commonwealth of

4

Puerto Rico and thus citizen of the Commonwealth of Puerto Rico for purposes of 28 U.S.C. § 1332(a). For over 80 years, Plaintiff has operated hospitals and healthcare facilities serving the public in Puerto Rico, including people with disabilities, chronically ill patients, elderly people, family members seeking information and care, and other vulnerable members of the community.

21.     Plaintiff Hospital Menonita Ponce, Inc. is a nonprofit corporation organized under the laws of Puerto Rico with its principal place of business in the Commonwealth of Puerto Rico and thus citizen of the Commonwealth of Puerto Rico for purposes of 28 U.S.C. § 1332(a).

22.     Sistema de Salud Menonita is the operating identity or trade name through which Mennonite General Hospital, Inc.'s healthcare operations are publicly presented and through which hospital and related healthcare services are offered and promoted in Puerto Rico.

23.     Plaintiff Hospital Menonita Ponce, Inc. owns one of the healthcare facilities that operates under the identity or trade name Sistema de Salud Menonita and which is located at 2FQ3+73M, Calle Acerola, Coto Laurel, Ponce 00780.

24.     Plaintiffs institutional standing and reputation depend in substantial part on public trust, patient confidence, confidence in Plaintiffs ethical standards, and the public's belief that Plaintiffs deal responsibly and lawfully with sensitive information.

25.     Defendant José Carlos Vélez Colón is a natural person licensed to practice law in Puerto Rico, domiciled in the State of Florida and thus a citizen of that state for purposes of 28 U.S.C. § 1332(a).

26.     Defendant Vélez Law Group, LLC is a limited liability company organized under the laws of the State of Wyoming with its principal office in 30 N Gould St Ste R, Sheridan, WY 82801 and engaged in the business of providing legal services. Mr. Vélez is the sole member of

Velez Law Group, LLC.  Hence, Vélez Law Group, LLC is a citizen of Florida for purposes of 28 U.S.C. § 1332(a).

27.     Upon information and belief, Vélez Law Group, LLC is the law firm expressly referenced, promoted, and used as a contact destination on the *Ley ADA Puerto Rico* Facebook platform.

28.     Mr. Vélez and Vélez Law Group participate in authoring, editing, managing, approving, amplifying, publishing, republishing, or otherwise causing the dissemination of the challenged statements.

## IV. STATEMENT OF FACTS

A.  The *Ley ADA Puerto Rico* Page Publicly Presents Itself as a Rights and Awareness Page but Functionally Operates as a Client Generation Platform for Defendants.

30.     The Facebook page *Ley ADA Puerto Rico* publicly presents itself as an information and public awareness page concerning rights of people with disabilities and accessibility barriers in Puerto Rico.

31.     The page includes language encouraging readers to "report barriers" ("*reporta aquí las barreras*"), not remain silent, and help create a "real map" of alleged obstacles faced daily by people with disabilities. But the page's public facing content does materially more than educate.

32.     The page tells readers that, if they wish to initiate a claim, they should consult counsel and consider Vélez Law Group, described as a law firm dedicated to representing people with disabilities.

33.     The page provides a specific Vélez Law Group email address ("VLG@VELEZLAWGROUP.COM").

34.    The page states that the person seeking legal counsel will not need to make any upfront payment.

35.    Immediately after providing Vélez Law Group's email and informing that no upfront payment will be necessary, the page further states that if the person prefers to be contacted by telephone, the person may provide a phone number and "we will gladly contact you" ("*Si prefiere ser contactado por teléfono, por favor proporcione su número de teléfono y con gusto le contactaremos.*").

36.    The page also offers to communicate with other lawyers on behalf of a reporting person to evaluate the possibility of representation.

37.    That structure is highly significant. It demonstrates that the page does not merely collect information for abstract advocacy purposes. Rather, it is designed to capture leads, identify individuals with potential claims, encourage them to view themselves as victims of legal violations, and route them toward a law firm. Upon information and belief, Defendants further promote and amplify this effort through the use of Facebook sponsored advertisements, paying to extend the reach of the page and its associated allegations to individuals beyond Defendants' existing audience. The use of sponsored advertising reflects a deliberate strategy to maximize exposure, recruit potential claimants, and generate legal business by disseminating the challenged statements to a broader and targeted segment of the public.

38.    The page thus functions as a hybrid platform combining public-facing advocacy rhetoric with a practical client intake and litigation generation mechanism.

39.    That characterization is reinforced by the content and sequence of the posts at issue, which repeatedly follow the same formula: identify a target, accuse the target of broader

wrongdoing, suggest additional affected persons may exist, and invite those persons to come forward and contact Defendant's practice.

B. Facts Supporting Mr. Vélez's Responsibility for, Control Over, or Ratification of the Page.

40. Upon information and belief, Mr. Vélez exercises operational, editorial, financial, managerial, or effective control over the Ley ADA Puerto Rico page.

41. The page specifically promotes Vélez Law Group by name.

42. The page specifically provides contact information for Vélez Law Group.

43. The page's stated objective is not simply to raise awareness but to facilitate complaints and route users to counsel.

44. The contact architecture of the page is tied to Defendant's law practice.

45. On March 2026, the page published multiple posts which content invited persons seeking direct advice ("*asesoría directa*") to use a phone number that, when activated, led to Vélez Law Group's business WhatsApp account.

46. That integration is not incidental. It shows that the page and the firm function in tandem.

47. The content of the page is also consistent with Mr. Vélez's known professional activities and litigation history in the ADA and accessibility sphere.

48. The page's repeated encouragement of reporting, confidential communication, and legal follow-up aligns with the business interests of a plaintiff-side accessibility practice.

49. The page's calls to action culminate, repeatedly, in an invitation to contact Defendant's law firm or channels tied to it.

50. Moreover, the belief that Mr. Vélez is responsible for and controls the *Ley ADA Puerto Rico* Facebook page is further supported by platform generated information that previously appeared on the page.

51. Specifically, previously the "About" section of the *Ley ADA Puerto Rico* Facebook page included a designation stating: "Jose Carlos Velez Colon is responsible for this Page."

52. This statement appeared within the page's "Details" section under the category "Page · Community," and was presented as platform-level information concerning page responsibility.

53. Another page, by the name *Apoyaalosdeaqui* captured a screenshot of this information contemporaneously, accurately reflecting how the page publicly identified Mr. Vélez as the individual responsible for the page. At the time of this Complaint, *Apoyaalosdeaqui* continues to display the screenshot as part of an April 8, 2025, post critical of Mr. Vélez vexatious litigation practices.

54. Upon information and belief, this attribution was generated, displayed, or authorized through Facebook's page management and transparency features.

55. As recent as May 25, 2026, the page again displayed information that indicated: "Jose Carlos Velez Colon is responsible for this Page. This is a person or organization that has completed our verification process and claimed responsibility for this Page."

56. This attribution, together with the operational structure of the page and its integration with Defendant's law practice, supports a strong inference that Defendant Vélez exercised control over, directed, or at minimum knowingly authorized and ratified the content published on the page.

57.    Mr. Vélez and his limited liability company are responsible for the publication of the defamatory statements described in this Complaint.

58.    Even if any Defendant later contends that another person physically drafted or uploaded a given post, Mr. Vélez at minimum adopted, ratified, benefited from, and failed to repudiate or remove the challenged content while that content was being used to direct potential claimants toward his firm.

59.    The page's repeated references to his firm, the routing of traffic to his channels, and the use of the page as a means to identify prospective claims support a strong inference that Mr. Vélez is responsible for the page's content or, at the very least, materially participated in or ratified it.

C.    Mr. Vélez's Pattern of ADA Litigation, Judicial Findings of Frivolous Filings, and Sanctions.

60.    Mr. Vélez is not a casual online speaker unfamiliar with legal standards or the consequences of making accusations of statutory violations. He is a practicing attorney associated with repeated ADA litigation.

61.    Mr. Vélez represented the plaintiff in *Betancourt Colón v. Tivoli Foods & Sport, Inc.*, KLAN202301095, 2024 WL 2349731 (P.R. Ct. App. Apr. 30, 2024). In that case, the Puerto Rico Court of Appeals affirmed dismissal with prejudice of an ADA claim for lack of standing. The court held that the plaintiff had failed to allege a concrete, real, and immediate injury. The appellate court explained that even under liberal pleading standards, the plaintiff was required to allege clear facts demonstrating a particularized injury and had failed to do so. The court rejected generalized descriptions of barriers that were not tied to a sufficiently pleaded personal injury. The court also rejected the notion that "tester" status, standing alone, sufficed to

10

satisfy the requirement of concrete injury. Crucially, the court concluded that the litigation was frivolous and imposed $5,000 in attorneys' fees as sanctions for temerity.

62. The concurring vote by Judge Rodríguez Casillas described a much broader pattern: more than one hundred similar lawsuits filed within a relatively short period and many involving substantially identical allegations against a broad range of defendants.

63. The concurrence described the pattern as systematic and raised concerns regarding abuse of the judicial process and possible ethical impropriety.

64. Plaintiffs allege those facts not to argue that every prior case filed by Defendant lacked merit, nor to assert any disciplinary conclusion beyond what the materials state, but because those facts are highly relevant to Defendant's sophistication, knowledge, motive, and fault in this case.

65. A lawyer with Mr. Vélez litigation background knows the importance of framing facts in a way that suggests actionable wrongdoing.

66. A lawyer with that background also understands how alarming allegations can generate claims, public pressure, and prospective clients.

67. The challenged publications mirror the same broader strategy reflected in the page's design: identify a violation, portray it as systemic or egregious, and then invite others to come forward so that more claims may follow.

D. The February 24, 2026, Mennonite Systems Post Demonstrates Context, Pattern, and the Client-Channeling Strategy.

68. On February 24, 2026, the *Ley ADA Puerto Rico* page published a post concerning lawsuits involving Mennonite hospitals.

69. The headline stated, in substance, that lawsuits revealed an alleged systematic pattern of discrimination against people with disabilities in Mennonite hospitals in Puerto Rico.

11

70.     The post summarized the purported allegations from two pending lawsuits involving Mennonite facilities in Cidra and Aibonito.

71.     The post described the purported allegations in considerable detail, including alleged barriers involving parking, ramps, routes, waiting rooms, dispensers, customer-service counters, and bathrooms.

72.     The post then asserted that the allegations, considered together, suggested a possible pattern of institutional noncompliance.

73.     The post further announced that the matter was under active investigation.

74.     It stated, in substance, that there could be other people with disabilities who had faced similar barriers in Mennonite facilities or elsewhere and who might not know those conditions could constitute violations of law.

75.     The post then invited such people, or their family members, to communicate confidentially to explore their rights.

76.     The post provided contact channels tied to Mr. Vélez's law firm

77.     This first post is relevant because it reveals the operational pattern of the page: public accusation, suggestion of broader wrongdoing, declaration of investigation, invitation for additional claimants, and direction toward Mr. Vélez's legal services.

78.     The February 24 post further illustrates motive, page control, client-channeling, and a recurring method of turning public accusations into potential new claims.

    E.   The Defamatory March 2, 2026, Post About Plaintiffs Website.

79.     On March 2, 2026, the page published the central post at issue in this case.

80.     The post includes the following image:



81.      The image is a sensationalist enhanced photograph of the hospital of the Sistema de Salud Menonita located in Ponce with futuristic surveillance and data-network imagery. The manipulated image falsely depicts the Sistema de Salud Menonita as a technologically omniscient institution engaged in widespread cyber-surveillance, evoking a dystopian environment of constant monitoring. The image was not intended to inform the public but rather to provoke alarm, generate outrage, and reinforce the defamatory narrative advanced by Defendants.

The post is prominently styled as an announcement of factual "findings" ("*hallazgos*") and asserted: "Investigation Reveals: The Mennonite Hospital Website Spies on Its Visitors" ("*Investigación revela: el sitio web del Hospital Menonita espía a sus visitantes*"). The post identifies the website **www.sistemamenonita.com.**

82.      That headline alone carries a clear and forceful accusation.

83.     It does not state that the site uses analytics.

84.     It does not state that the site uses cookies or measurement tools.

85.     It does not state that the site uses common digital technologies that are also described in Plaintiffs disclosures.

86.     Instead, it uses the inflammatory verb "spies" ("*espía*"), a term that in ordinary language communicates covert monitoring, hidden observation, and ethically or legally suspect conduct.

87.     The body of the post then asserts that an "independent digital privacy inspection" revealed that Plaintiffs are "secretly monitoring" ("*vigilando secretamente*") the activity of every person who visits their site and sharing that information with technology giants such as Facebook (Meta), Google (Alphabet), and Amazon.

88.     The post further asserts that this is occurring without the knowledge or informed consent of visitors.

89.     The post describes the existence of Facebook Pixel, Google Analytics, Google Tag Manager, Google Ads conversion tracking, DoubleClick-related functionality, YouTube-related cookies, and Amazon CloudFront, and then translates those technical references into the accusation that Plaintiffs are operating a "worrying digital surveillance scheme" ("*esquema preocupante de vigilancia digital*").

90.     The post repeatedly emphasizes that Plaintiffs website is not "just any commercial site" but a healthcare site used by persons seeking medical information, by persons with disabilities, by patients, and by family members in moments of vulnerability.

91.     The post then asserts, in substance, that when a person with disabilities, a patient with a chronic condition, or a family member of a hospitalized patient visits Plaintiffs' site,

Plaintiffs have decided, as a matter of institutional policy, to share that visit with Facebook, Google, and Amazon.

92. The post further states that those corporations could infer an interest in healthcare services and direct related advertising, thereby creating an unauthorized digital profile of the visitor.

93. The post then amplifies the accusation by declaring that this reflects an "administrative decision" and an institutional "digital surveillance policy" imposed at the corporate level.

94. The post also states, in editorial and accusatory terms, that Plaintiffs are treating patients and visitors "like a product" ("*como un producto publicitario*").

95. The post closes not by stopping at commentary, but by again inviting people with disabilities who had encountered physical or architectural accessibility barriers at Menonita facilities to come forward because the group was attentive, prepared, and ready to act.

96. Thus, the March 2 post (a) publicly falsely accuses Plaintiffs of secret and ethically alarming digital misconduct; *and uses that false accusation as part of a client channeling strategy*.

97. The publication prominently featured an image depicting the hospital that operates in Ponce together with the name and brand identifier "Sistema de Salud Menonita." By including a photograph of Plaintiffs' healthcare facility and expressly displaying the Sistema de Salud Menonita trade name, Defendants unmistakably identified Plaintiffs as the subjects of the publication and associated the challenged statements directly with Plaintiffs' healthcare operations, reputation, and services. The use of Plaintiffs' hospital image and brand name was intentional and served to reinforce to viewers that the allegations contained in the publication

15

concerned Plaintiff, thereby increasing the likelihood that members of the public would attribute the statements to Plaintiff and rely upon them when forming opinions regarding Plaintiff's integrity, professionalism, and handling of sensitive patient information.

98.     The Facebook Ad Library for the Ley Ada Puerto Rico page reflects that the publication complained of herein was promoted as a paid advertisement by the Ley Ada Puerto Rico page, which is controlled by Mr. Vélez, with the purpose and effect of maximizing its exposure and reach to the public.





F.  The Reach, Amplification, and Public Impact of the Challenged Posts.

99.  The *Ley ADA Puerto Rico* page, which continues to display the March 2 post, is open for public viewing and had 57,025 followers on the date this Complaint was filed.

100.  The March 2 post has so far generated approximately 637 reactions, 98 comments, and 573 shares.

101.  Those figures demonstrate that the challenged statements are widely seen, actively engaged with, and repeatedly redistributed.

102.  A post that is shared hundreds of times is not confined to direct followers of the original page.

103.  It is broadcasted into additional personal and social networks, reappears in new contexts, and reaches audiences far beyond the page's initial subscriber base.

104.  Reactions, comments, and shares also increase the appearance of urgency and credibility to later readers.

105.    Moreover, upon information and belief, Defendants further amplify the reach and impact of the defamatory statements by utilizing Facebook's paid advertising and sponsored-post features, causing the publication to be intentionally disseminated beyond Defendants' organic audience and to targeted members of the public.

106.    In the healthcare setting, that amplification is especially harmful because the accusation is directed to the very qualities on which hospitals' relationships with members of the public depends: trust, confidentiality, institutional ethics, and treatment of vulnerable people.

107.    A viral accusation that a hospital website secretly spies on visitors and shares their information with large technology companies predictably undermines public confidence and damages reputation in a way that is immediate and difficult to contain.

G. Plaintiffs' Website Disclosures Publicly and Openly Describe Cookies, Analytics, Advertising/Optimization Tools, and User Controls.

108.    At the time Defendants first published the March 2 post, Plaintiffs' website contained publicly accessible disclosures concerning cookies, analytics, privacy practices, and related website technologies.

109.    Those disclosures included, among other things, accurate cookies and privacy policies.

110.    The cookies policy explained that certain cookies are essential to the functioning of the site and cannot be disabled in Plaintiffs' systems because they enable functions such as secure navigation and access to protected areas.

111.    The cookies policy also disclosed the use of tools such as Google Analytics and Google Tag Manager.

112.    The cookies policy further disclosed that such tools may collect information such as anonymized IP address, browser type, pages visited, session duration, and device used.

113. The cookies policy also disclosed the use of advertising or optimization cookies such as Meta Pixel and Google Ads.

114. Critically, the cookies policy stated that Sistema Menonita does not share medical information or clinical data with advertising platforms or analytics tools.

115. The same policy further stated that measurement tools are configured to avoid collection of information relating to medical conditions, clinical forms, medical results, and patient information.

116. The cookies policy also stated that visitors may accept, reject, or configure nonessential cookies through the site's consent banner and may configure their browsers to block or delete previously installed cookies.

117. Plaintiffs' privacy policy likewise clearly disclosed that when users interact with the site, certain information about usage may be collected automatically.

118. That policy described categories of automatically collected information, including computer and connection data, page-view statistics, traffic to and from the site, referral URLs, IP address, and device identifiers.

119. The privacy policy also stated that much of that information may be collected through cookies, web beacons, or other tracking technologies.

120. It further addressed interest-based advertising and explained that advertisers or sponsors may use cookies to measure effectiveness or offer advertising related to likely interests.

121. The privacy policy also described Google Analytics and stated that the site does not use Google Analytics to gather personally identifying information.

122. The privacy policy additionally provided means for users to ask questions or seek further information regarding the policy.

123.    Thus, Plaintiffs' website did not conceal the existence of cookies, analytics, advertising or optimization tools, or the collection of technical browsing-related information.

124.    To the contrary, Plaintiffs publicly described those practices, identified categories of tools, described their general purpose, stated that medical and clinical information were not shared through them, and disclosed user options with respect to non-essential cookies. Far from "spying" tools, the website uses and discloses the presence of commonly used digital tools and then explains their ordinary technical role.

125.    The website utilizes Webflow as its design, development, and hosting platform. Webflow is a widely used website-building and hosting service employed by businesses, organizations, and governmental entities throughout the world. As part of its ordinary operation, Webflow may utilize technical, security, performance, and analytics-related technologies, including cookies and similar tools commonly used to facilitate website functionality, content delivery, security, and performance monitoring.

126.    The website contains video content embedded through YouTube's official embed functionality. Embedded YouTube videos are a standard and widely accepted method of displaying video content on websites. The use of such embedded content may result in the placement of cookies or similar technologies by YouTube and/or Google for purposes related to video playback, user preferences, service functionality, and analytics.

127.    The technologies described above are commonly used throughout the internet and are routinely implemented on websites of all types. The website's use of Webflow and embedded YouTube content was consistent with ordinary website operation and content delivery practices.

128.    Accordingly, statements characterizing the Website's use of such technologies as "spying" on visitors are false, misleading, and unsupported by the actual functionality of the Website or the technologies employed thereon.

129.    The website, like virtually all websites connected to the internet, merely receives certain basic technical information automatically transmitted by a visitor's browser or device as part of standard internet communications protocols, including HTTP requests. Such information may include browser type, operating system, screen resolution, Internet Protocol ("IP") address information, user-agent strings, and similar technical data necessary for the transmission and rendering of web content.

130.    Such technical information is collected and processed for legitimate and customary purposes, including website functionality, compatibility, security, troubleshooting, performance monitoring, aggregate usage statistics, and user-experience optimization.

131.    The receipt of such technical information is a routine and inherent aspect of operating a website and does not, by itself, permit the direct identification of a particular visitor. The collection of such information is commonplace throughout the internet and is not unique to the website.

132.    Accordingly, any statement characterizing the Website's receipt of such automatically transmitted technical information as "spying" on visitors was false, misleading, and unsupported by the actual operation of the Website.

133.    The tools in question are widely used in the modern digital ecosystem, including by healthcare portals, universities, nonprofit organizations, and government agencies.

134. The principal functions of these tools are statistical measurement, portal optimization, technical management, and infrastructure performance. Importantly, these do not transmit protected health information to the platforms in question.

135. With respect to Google Analytics, it is a tool used to measure traffic volume, identify the most visited pages, analyze general traffic, and support decisions about informational content.

136. Google Analytics does not access clinical records, does not receive medical diagnoses, does not access internal hospital systems, and collects aggregate and technical information rather than protected medical data.

137. With respect to Google Tag Manager, it is a technical management tool used to centralize implementation of scripts such as Google Analytics or Google Ads.

138. Google Tag Manager is not a database or a data storage mechanism.

139. Amazon CloudFront is a content delivery network infrastructure service used to improve load speed, distribute content, protect against interruptions or attacks, and ensure stability and performance.

140. Amazon CloudFront is not an advertising tool, is not a profiling tool, and does not access clinical data.

141. The webpage also uses measurement and remarketing tools, including GA4, Google Ads conversion tracking and remarketing tags, and Meta Pixel. These do not secretly surveil patients, transmit protected health information, or covertly monitor medical records or clinical systems. In sum, the website employs commonly used technologies, many of which Plaintiffs also publicly disclosed.

   H. The Challenged Statements Are False and Defamatory.

22

142. The March 2 post is false and defamatory in multiple respects.

143. First, it describes as "secret" ("*secreta*") practices that Plaintiffs publicly disclosed.

144. A practice described in a public cookies policy and public privacy policy cannot fairly be characterized to the public as secret.

145. Defendants affirmatively and falsely represented to readers that Plaintiffs are "secretly" ("*secretamente*") monitoring every visitor and operating a covert surveillance scheme.

146. Second, the challenged post uses the word "spies" ("*espía*") and repeatedly invokes "surveillance" ("*vigilancia*"), thereby transforming a discussion of ordinary website technologies into an accusation of clandestine, invasive, and ethically improper monitoring.

147. In ordinary language, "spying" conveys hidden observation of persons, typically without their knowledge and for improper or suspect ends.

148. Defendants chose that term precisely because it carries a connotation of covert wrongdoing.

149. But the underlying facts reflected in Plaintiffs' public disclosures rebut that characterization.

150. Third, the challenged post falsely asserts that Plaintiffs are collecting and sharing sensitive healthcare related information in a manner that is functionally equivalent to revealing private patient information to Meta, Google, Amazon, and similar entities.

151. Yet, the publicly available and easily verifiable Plaintiffs' cookies policy states that medical information and clinical data are not shared with advertising platforms or analytics tools.

23

152. The cookies policy further explains that the measurement tools are configured to avoid collection of information relating to medical conditions, clinical forms, medical results, and patient information. And no transmission of protected health information has occurred.

153. The tools employed on the website do not access clinical records, do not receive diagnoses, and do not access internal hospital systems.

154. Defendants' accusations therefore falsely state the nature of the tools. They invent a false and inflammatory equivalence between ordinary disclosed website technologies and the secret harvesting or dissemination of sensitive patient information.

155. Fourth, the challenged post falsely portrays the website tools as evidence of a unified "digital surveillance scheme" ("*esquema de vigilancia digital*") and an "institutional policy" of monitoring vulnerable persons.

156. The post thus does not merely describe the presence of certain tools. It imputes motive, policy, and corporate level ethical misconduct.

157. In substance, the post falsely tells readers that Plaintiffs made a conscious administrative decision to exploit patients, people with disabilities, and worried family members as data points for commercial use.

158. Fifth, Defendants' use of the term "without informed consent" is also false.

159. Plaintiffs disclosed their use of cookies and related tools and provided user-facing mechanisms to accept, reject, or configure nonessential cookies.

160. Defendants did not tell readers that such disclosures and choices existed.

161. Instead, Defendants stripped out the disclosed context and replaced it with the false accusation that the entire process occurred secretly and without the visitors' knowledge.

162. Sixth, the post's repeated use of highly personalized and vulnerability centered language was crafted to make the accusations more damaging.

163. The post did not simply refer to generic web visitors.

164. It repeatedly invoked "persons with disabilities," "patients with chronic conditions," and "family members of hospitalized patients."

165. That rhetorical move mattered because it encouraged readers to incorrectly understand the challenged conduct not as a debate over ordinary web tools, but as the intentional exploitation of vulnerable persons at moments of medical need.

166. That accusation is especially damaging in the healthcare context because it attacks not merely operational choices, but moral and institutional character.

167. Seventh, the post's assertion that Plaintiffs treat visitors "like a product" ("*como un producto publicitario*") is likewise materially false and defamatory when read in context.

168. That statement appears alongside specific accusations that Plaintiffs' website secretly spies on visitors, shares their information without consent, and operates a surveillance scheme.

169. Read together, the post communicates to the ordinary reader that Plaintiffs are knowingly and improperly commodifying patient and visitor information. That is false.

170. Eighth, Defendants' invocation of an "independent digital privacy inspection" and an "investigation" ("*investigación*") was itself materially misleading because it conferred a false air of technical objectivity and rigor on conclusions that did not fairly follow from the underlying facts.

171. If an "investigation" reveals disclosed cookies, analytics tools, measurement scripts, and infrastructure services, but does not identify transmission of protected health

information, access to clinical records, or integration with internal clinical systems, it is materially false and defamatory to present the result to the public as proof that the hospital website "spies on" visitors.

172. Ninth, Defendants fuse together categories of tools and functions that are analytically distinct.

173. Cookies, analytics, tag management, advertising conversion measurement, video related cookies, device/browser information, and content delivery infrastructure were rhetorically combined and described to the public as though they were all part of a single covert and sinister apparatus.

174. That presentation is misleading because it intentionally omits the differences among those technologies and seeks to have readers believe that every such tool operates as part of one secret monitoring scheme aimed at patients and visitors.

175. Tenth, Defendants blur the distinction between technical web interaction data and sensitive patient medical information.

176. A website's awareness of page loads, browser type, device type, technical events, or aggregated visit patterns is fundamentally different from access to diagnoses, treatment records, clinical test results, or protected health information.

177. The challenged post was written in a way designed to cause readers to ignore that distinction. By emphasizing hospitals, disabilities, chronic conditions, and family vulnerability, Defendants caused readers to infer that hospital related browsing necessarily meant sensitive medical information was being secretly harvested and shared. That implication is false.

178. The most damaging part of the publication in the mind of the ordinary reader is not simply that the site uses common digital tools. It is that Plaintiffs' operation via hospitals and

healthcare providers, supposedly chose to engage in secret, exploitative, and ethically alarming monitoring of vulnerable persons for commercial purposes. That is also false.

179. Plaintiffs' cookies policy and privacy policy is publicly available and was when Defendants published the March 2 post.

180. Those disclosures are not hidden in proprietary systems or unavailable to an interested reader. They were and continue to be publicly accessible on Plaintiffs' website.

181. Defendants tell readers they conducted an "digital privacy independent investigation" ("*investigación*")."

182. By using that language, Defendants represented that they had reviewed the relevant facts and were reporting the results of a technically grounded inquiry.

183. If Defendants actually reviewed Plaintiffs' cookies and privacy disclosures, then they knew or at minimum were directly confronted with the fact that Plaintiff publicly disclosed the use of cookies, analytics tools, optimization tools, and user choice mechanisms.

184. If Defendants reviewed those disclosures, then they also knew that Plaintiffs stated that medical information and clinical data were not shared with advertising or analytics platforms and that tools were configured to avoid collecting information tied to medical conditions, forms, results, and patient information.

185. If Defendants reviewed those disclosures, then Defendants knowingly or recklessly ignored facts directly inconsistent with the categorical accusation of secret spying and nonconsensual sharing.

186. If, on the other hand, Defendants did not review those disclosures, then their repeated invocation of an "investigation" was itself reckless and misleading.

187.    The Defendants recklessly portrayed the use of ordinary technologies and tools commonly used by websites for purposes of functionality, performance monitoring, technical, security, content delivery as too "spying" on visitors. Those statements are false, misleading, and unsupported by the actual functionality of the website or the technologies employed thereon.

188.    Such technical information is collected and processed for legitimate and customary purposes, including website functionality, compatibility, security, troubleshooting, performance monitoring, aggregate usage statistics, and user-experience optimization.

189.    Accordingly, any statement characterizing the website's receipt of such automatically transmitted technical information as "spying" on visitors was false, misleading, and unsupported by the actual operation of the website.

190.    The gap between what Plaintiffs disclosed and what Defendants told the public strongly supports at least negligence and, on information and belief, actual malice or reckless disregard for truth.

191.    This conclusion is strengthened by Mr. Vélez's background as an attorney and his association with repeated accessibility-related litigation.

192.    Defendants are not unsophisticated laypersons casually reacting to a technical issue they do not understand.

193.    Mr. Vélez is a lawyer who uses a page dedicated to legal rights enforcement and who has repeatedly engaged in litigation concerning alleged statutory violations.

194.    A lawyer with that background knows the value of language that suggests systemic misconduct, institutional indifference, or actionable legal violations.

195.    A lawyer with that background also understands how alarming factual narratives can generate attention, pressure targets, and attract claimants.

28

196.   Defendants chose targeted, inflammatory, and false statements.

197.   Defendants did not publish the challenged statements merely to comment on website technology or to participate in a public debate about digital practices.

198.   Rather, Defendants used the challenged statements as part of a broader strategy to identify, cultivate, and channel potential clients into new claims and lawsuits.

199.   The structure of the *Ley ADA Puerto Rico* page itself illustrates this.

200.   The page does not stop at public discussion or general rights education.

201.   It repeatedly directs such communication to Defendant's law practice and legal channels.

202.   The February 24 Menonita hospitals post illustrates this method.

203.   That post summarizes alleged barriers, suggested broader institutional wrongdoing, announced an ongoing investigation, and invited additional people affected by similar issues to contact the page and Mr. Vélez's firm.

204.   The March 2 alleged website tracking post follows the same pattern.

205.   It first publishes a sensational accusation of digital wrongdoing.

206.   It then immediately pivots to a call for people with disabilities who had faced physical or architectural barriers at Menonita facilities to come forward because the group was attentive, prepared, and ready to act.

207.   The coupling of those two moves is not accidental. It is a funnel. First, it seeks to create outrage and suspicion toward Menonita. Then it invites purportedly affected persons to contact Defendant's legal channels.

208.   The page's contact structure reinforces this conclusion.

209.   The page specifically recommends Vélez Law Group.

210. It provides a Vélez Law Group email address.

211. It invites users to submit their phone numbers for further contact.

212. It offers to communicate with other lawyers on behalf of the reporting person.

213. The other March 2026 posts use of a telephone number leading to Vélez Law Group's WhatsApp business account is further evidence that the page's operational endpoint is Defendant's legal practice.

214. Upon information and belief, Defendants intended that readers of the challenged Menonita post would infer that the institutions engaged in systemic wrongdoing and that affected individuals should contact Defendant's firm to explore legal claims.

215. The challenged statements therefore served a dual function: reputational attack and client acquisition.

I. Defendants' Statements Are Particularly Defamatory to Healthcare Providers.

216. The challenged statements are defamatory not merely because they are false, but because of what they communicate to ordinary readers in the context in which they were made.

217. Statements accusing a hospital system of secretly spying on visitors, sharing their information without consent, and treating patients like advertising products has a severe effect.

218. In the healthcare setting, public confidence is essential. Patients and family members must trust that healthcare institutions handle information responsibly, act ethically, and do not exploit vulnerability.

219. By accusing Plaintiffs of secret surveillance and covert sharing of visitor information, Defendants attacked that trust directly.

220. The accusations imply not only technical impropriety but moral and institutional wrongdoing.

30

221.    They suggest that Plaintiffs are willing to exploit medically vulnerable people for digital and commercial purposes.

222.    They suggest that Plaintiffs are untrustworthy custodians of sensitive information.

223.    They suggest that Plaintiffs operate in a manner inconsistent with the ethical expectations of hospitals and healthcare providers.

224.    Those implications tend naturally to expose Plaintiffs to distrust, contempt, aversion, public disfavor, and reputational injury.

225.    That is especially true where the post repeatedly invoked people with disabilities, people with chronic conditions, and family members of hospitalized patients.

226.    In other words, Defendants did not just accuse Plaintiffs of using web tools. They falsely accused Plaintiffs of morally suspect institutional conduct toward vulnerable people. Those are classic examples of defamatory statements.

J.    Harm to Plaintiffs

227.    Plaintiffs have suffered substantial and ongoing harm as a direct result of Defendants' conduct.

228.    Plaintiffs' reputation has been injured among patients, prospective patients, family members, collaborators, vendors, healthcare professionals, and the public.

229.    Plaintiffs' goodwill has been damaged.

230.    Public trust in Plaintiffs' handling of website related information and, more broadly, in Plaintiffs' institutional integrity has been undermined.

231.    Plaintiffs have had to devote managerial, legal, communications, digital, and operational resources to reviewing, investigating, responding to, and mitigating the impact of the challenged statements.

31

232. Plaintiffs have incurred internal and external costs associated with that mitigation.

233. Because the challenged statements were widely shared and remain subject to continued online circulation, the harm is ongoing.

234. Each additional view, share, repost, or reference compounds the injury.

235. Once the public is told that a hospital secretly spies on visitors and shares their information without consent, the resulting distrust and suspicion cannot be perfectly unwound through money damages alone.

236. That is particularly so in a healthcare setting where confidence, reassurance, and institutional integrity are central to continued operations and public acceptance.

## V. COUNT I - DEFAMATION UNDER PUERTO RICO LAW

237. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

238. Under Puerto Rico law, a defamation claim arises from three sources: (i) Article II, section 8 of the Puerto Rico Constitution; (ii) the Libel and Slander Act of 1902, 32 L.P.R.A. §§ 3141-49; and (iii) Article 1536[1] of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801.

239. Under Puerto Rico law, defamation consists of the publication of a false and defamatory statement concerning the plaintiff, communication of that statement to third parties, fault, and resulting damages.

240. Defendants published statements concerning Plaintiffs to third parties through the *Ley ADA Puerto Rico* page.

241. The statements were false and materially misleading for the reasons alleged above.

---

[1] Article 1536 of the Civil Code of 2020 substituted Article 1802 of the Civil Code of 1930 as Puerto Rico's general tort provision.

32

242.    The challenged statements were statements of fact, or were presented as statements of fact, not mere opinion.

243.    In particular, Defendants expressly represented that the statements resulted from an "investigation" ("*investigación*") and an "independent digital privacy inspection," thereby claiming factual and technical authority.

244.    The challenged statements falsely accused Plaintiffs of spying on visitors, engaging in secret surveillance, sharing information without the knowledge or informed consent of visitors, operating a digital surveillance scheme, and treating patients and vulnerable visitors as advertising products.

245.    Those statements are defamatory because they impute unethical, exploitative, deceptive, and potentially unlawful conduct to Plaintiffs.

246.    In the healthcare context, such accusations naturally tend to expose Plaintiffs to distrust, contempt, public disfavor, and significant reputational harm.

247.    The statements were communicated broadly to a large audience and were amplified by reactions, comments, and shares.

248.    Readily available public disclosures contradicted the claim that Plaintiffs practices were secret or undisclosed and because the technical materials did not support the accusation that Plaintiffs' website secretly spied on patients or transmitted protected health information.

249.    Defendants either knew of Plaintiffs' public disclosures and chose to invert their meaning or falsely invoked an "investigation" without adequately reviewing basic, readily available information.

250. The difference between disclosed website technologies and secret spying is so substantial that Defendants' phrasing cannot reasonably be characterized as a merely innocent or immaterial misdescription.

251. Defendant Vélez's sophistication as an attorney, his use of the page to generate legal leads, and his documented litigation background further support the inference of knowing falsity or reckless disregard.

252. Plaintiffs have suffered damages as a direct and proximate result of Defendants' defamatory statements.

253. Plaintiffs are entitled to recover all damages available under Puerto Rico law.

254. At this time, Plaintiffs estimate that they have suffered $5,000,000 in damages.

## VIII. JURY DEMAND

255. Plaintiffs demand a trial by jury on all issues so triable.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and grant the following relief:

A. Enter judgment for Plaintiffs and against Defendants on both counts;

B. Award Plaintiffs all damages recoverable at law, including compensatory damages in an amount of no less than $5,000,000;

C. Order such corrective measures as the Court deems just and appropriate;

D. Award costs, expenses, prejudgment interest, and post-judgment interest as permitted by law;

E. Grant such other and further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 2nd day of July 2026.

> **SEPULVADO, MALDONADO & COURET**
> 304 Ponce de León – Suite 990
> San Juan, Puerto Rico 00918
> Tel: (787) 765-5656
> Fax: (787) 294-0073
>
> */s/ Lee R. Sepulvado Ramos*
> Lee R. Sepulvado Ramos
> USDC-PR Bar No. 211912
> lsepulvado@smclawpr.com
>
> */s/ Albéniz Couret Fuentes*
> Albéniz Couret Fuentes
> USDC-PR Bar No. 222207
> acouret@smclawpr.com
>
>
> *Attorneys for Plaintiffs*